**SO ORDERED.**

**SIGNED March 31, 2021.**



_____
**JOHN W. KOLWE**
**UNITED STATES BANKRUPTCY JUDGE**

---

WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| In re:<br>Linder Oil Company, a Partnership,<br>*Debtor* | Case No. 17-51323 |
| Lucy G. Sikes, Chapter 7 Trustee, and<br>The Cadle Company II, Inc.<br>*Plaintiffs*<br><br>v.<br><br>AFCO Credit Corporation,<br>*Defendant* | Chapter 7<br><br>Judge John W. Kolwe<br><br>Adv. Proc. No. 19-5088 |

**RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Before the Court in this adversary proceeding are the competing Motions for Summary Judgment filed by the Defendant, AFCO Credit Corporation (ECF #39) and the Plaintiffs, Lucy G. Sikes, Chapter 7 Trustee, and The Cadle Company II, Inc (ECF #42). AFCO seeks summary judgment on all claims asserted in the Complaint, which are primarily claims arising under §§ 547, 548, 549 and 550 of the Bankruptcy Code, while the Plaintiffs seek summary judgment on Count I, avoidance of preferential

1

transfers, and on all of AFCO's affirmative defenses. The Court took these matters under advisement following oral argument. After considering the summary judgment record, the parties' arguments and the relevant authorities, and for the reasons set out below, the Court will grant AFCO's motion in part, on Counts II, III, IV, V, and VI, and on two of three issues on Count I; otherwise, AFCO's Motion will be denied. The Court will deny the Plaintiffs' Motion.

## JURISDICTION

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(F), (H) and (O), and the parties have consented to entry of final orders and judgments by this Court. AFCO challenges the Court's jurisdiction over Count II, concerning Cadle's separate conversion claim against AFCO, which the Court will address further below.

## BACKGROUND

The Debtor in the underlying bankruptcy case, Linder Oil Company, a Partnership, operated oil and gas wells offshore Louisiana. On October 10, 2017, it filed a voluntary petition under Chapter 7 of the Bankruptcy Code.

AFCO provides insurance premium financing to businesses and individuals pursuant to agreements with the insureds-borrowers under which it pays the loan proceeds directly to the insured-borrower's insurance carrier.

> This is a common practice in the insurance industry, because premium financing enables a commercial enterprise to prepay its insurance premiums in full at the inception of coverage without having to immediately expend large amounts of cash for the policy. In the standard arrangement, the insured pays roughly 15% to 20% of total premiums due at the inception of the policy. The remaining balance is advanced by the premium finance company. That advance, coupled with the insured's down payment, fully prepays the insured's premiums, resulting in full coverage for any loss covered by the policy.
>
> As collateral for the loan, the insured typically assigns to the premium finance company all unearned, "return" premiums (i.e., the premiums already received by the

insurer but for which insurance protection has not yet been provided). Although insurance premiums are typically prepaid at the inception of coverage, the insurer "earns" its premiums on a pro rated basis . . . Therefore, on the inception date of coverage, 100% of prepaid premiums are unearned by the insurance company. That balance diminishes each day as the insurer gradually earns its premiums. If the policy is canceled before the end of the term, the insurer must refund the unearned portion. The amount of the unearned portion is subject to simple calculation.

In addition to granting a security interest in its unearned premiums, the insured also typically gives the premium finance company limited power of attorney to cancel the policy in the event of default, after notice, and to take possession of its collateral—the unearned premiums. Premium finance companies require such provisions so that they do not become unsecured at any time during the period of a loan by virtue of their steadily declining collateral. These provisions provide a costless and quick remedy, which is to cancel the policy and recover the rest of the debt it is owed by receipt of unearned premiums directly from the insurer.

*Rocin Liquidation Estate v. UPAC (In re Rocor Intern., Inc.)*, 380 B.R. 567, 568-69 (10th Cir. B.A.P. 2007); citing *Schwinn Plan Comm. v. Transamerica Ins. Fin. Corp (In re Schwinn Bicycle Co.)*, 200 B.R. 980, 994-95 (Bankr. N.D. Ill. 1996).

Here, AFCO and the Debtor entered into such an arrangement. Effective December 31, 2016, the Debtor purchased two insurance policies from Lloyd's of London through Ellsworth Corporation, the insurance agent/broker on the transaction. The policies were for 12-month terms running from December 31, 2016, with the annual premium for both policies totaling $282,978.05. The Debtor made a cash down payment of $42,446.71 (roughly 15% of the total premiums) and financed the balance of the premiums ($240,531.34) with AFCO under the terms of an agreement entitled "Commercial Premium Finance Agreement–Promissory Note" dated January 5, 2017 ("Finance Agreement"). The Finance Agreement obligated the Debtor to repay the loan, plus a finance charge of $5,602.36 (computed at 5.05% APR), in 10 monthly installments of $24,613.37 each, commencing on February 1, 2017.

3

AFCO accepted the Finance Agreement on January 12, 2017 and funded the entire loan by remitting the loan proceeds directly to the insurer, such that when these proceeds were combined with Debtor's down payment, the insurer received full payment of the premiums due on the policies. Ex. B to the Plaintiffs' Motion (ECF #44-1), App. 024 (Depo 85:13-20).

To secure repayment of the loan, the Debtor granted AFCO a security interest in the unearned premiums on the insurance policies, and appointed AFCO as its attorney-in-fact for the limited purpose of canceling the insurance policies in the event Debtor defaulted in repaying the loan.[1] If AFCO canceled the policies, AFCO was entitled to the return, i.e., unearned, premiums up to the amount it was owed. Thus, the Finance Agreement was in conformity with the typical insurance premium financing arrangement used in the insurance industry as described above.

The Debtor timely paid the February, March, and April payments, but the May through August payments were all paid late. In each of those months, AFCO gave notice to the Debtor that the insurance policies would be canceled if that month's installment was not paid by a certain date. The Debtor made payment by the cancellation date in each of those months.

The Debtor also failed to pay the September payment by the due date, causing AFCO to give written notice that the insurance policies would be canceled if the September payment was not received by September 26. The Debtor did not pay, which resulted in AFCO sending a cancellation notice to Lloyd's of London via the agent/broker, Ellsworth, directing Lloyd's to cancel the insurance policies effective September 26, 2017, and to return all unearned premiums directly to AFCO. On November 3, 2017, AFCO received a wire transfer for $75,298.55 from Ellsworth representing the total returned premiums; AFCO then credited Debtor's account, leaving a zero-balance.[2]

---

[1] *See* ECF #55-1, p. 6, ¶¶ 3 and 12.

[2] *See* Plaintiffs' Statement of Undisputed Facts, Exhibit F to the Plaintiffs' Motion (ECF #44-1), App. 071 (see memo lines), and Exhibit C to the Plaintiffs' Motion (ECF #44-1), App. 056 (Interrogatory Response No. 4).

4

The Plaintiffs[3] filed this adversary action on October 9, 2019, seeking to avoid and recover, pursuant to §§ 547, 548, 549 and 550 of the Bankruptcy Code, certain transfers the Debtor made to AFCO, and to disallow any claims AFCO may have against the Debtor's bankruptcy estate as allowed under § 502(d) and (j) of the Code. In Count II, Cadle alone asserts a conversion claim under Louisiana state law against AFCO contending that AFCO wrongfully exercised and assumed authority over Cadle's collateral. AFCO answered the Complaint, denying all Counts, and asserting 16 affirmative defenses, including certain statutory defenses to the preference action.

## SUMMARY JUDGMENT STANDARDS

The parties filed competing motions for summary judgment which are presently before the court. AFCO seeks judgment on all eight of the Plaintiffs' claims, while the Plaintiffs seek judgment on Count I (avoidance of preferential transfers) and on all of AFCO's affirmative defenses.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 is applicable to adversary proceedings. *See* Fed. R. Bankr. P. 7056. The purpose of summary judgment is to pierce the pleadings, to assess the proof, and to determine whether there is a genuine need for trial. *Goodman v. Triple "C" Marine Salvage, Inc. (In re Gulf Fleet Holdings, Inc.),* 485 B.R. 329, 334 (Bankr. W.D. La. 2013), citing *Matsushita Electric Industries v. Zenith Radio Corp.* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). Summary judgment procedure is designed to isolate and dispose of factually unsupported claims or defenses. *Id.*, citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); If the movant bears the burden of persuasion at trial on a claim or defense addressed in the motion for summary

---

[3] Cadle claims to be owed $122 million, and to have a lien on all of the Debtor's assets. The Trustee and Cadle entered into a litigation support agreement under which they agreed to share any and all recoveries realized in certain lawsuits, including this one, with Cadle agreeing to pay the bankruptcy estate's costs of litigation. Under this agreement, each party retained ownership of their own claims. Thus, Cadle appears in this action for the sole purpose of asserting the only claim it purportedly owns, a conversion claim against AFCO (Count II of the Complaint).

5

judgment, the movant must establish that there is no genuine dispute of material fact as to those claims or defenses. To satisfy this burden, the movant must come forward with competent summary judgment evidence conclusively establishing that no reasonable trier of fact could find other than for the moving party. *Id.*, citing *Calderone v. United States,* 799 F.2d 254, 259 (6th Cir. 1986). To avoid summary judgment, the non-movant must then come forward with evidence showing that there is a genuine dispute of material fact.

If the non-moving party has the burden of persuasion at trial with respect to an issue addressed in the motion for summary judgment, the moving party may satisfy its initial burden by either (1) demonstrating affirmatively that there is no triable issue of fact as to each element of the non-moving party's affirmative defenses or claims, or (2) showing that the non-moving party cannot present evidence sufficient to satisfy the essential elements of its defenses or claims and thus cannot meet its burden of persuasion at trial. *Celotex Corp.,* 477 U.S. at 324–326, 106 S. Ct. 2548. If the moving party makes a showing that there is "no evidence" to support the non-moving party's claims or defenses, the non-moving party must come forward with "substantial" evidence showing a genuine dispute of material fact with respect to each essential element of its affirmative defenses or claims. *Id.* Substantial evidence for purposes of defeating summary judgment is evidence sufficient to support a jury verdict in the non-movant's favor. *In re Gulf Fleet Holdings, Inc.,* 485 B.R. at 334, citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Under this standard, the non-movant cannot rely on unsupported assertions or arguments but must submit sufficiently probative evidence supporting its claims or defenses. Even if the burden shifts to the non-moving party, the movant still retains the ultimate burden of persuasion on the motion for summary judgment. *Celotex Corp.,* 477 U.S. at 330–331, 106 S. Ct. 2548.

Under Local Bankruptcy Rule 7056-1, the bankruptcy court applies District Court Local Civil Rules 56.1 and 56.2 to the content of the motions and responses. LR 56.1 requires that every Motion for Summary Judgment "be accompanied by a separate, short and concise statement of the material facts as to which the moving

6

party contends there is no genuine issue to be tried." LR 56.2 requires that any Opposition to a Motion for Summary Judgment include

> a separate, short and concise statement of the material facts as to which there exists a genuine issue to be tried. All material facts set forth in the statement required to be served by the moving party will be deemed admitted, for purposes of the motion, unless controverted as required by this rule.

*Id.*

In support of its Motion, AFCO filed a separate Statement of Facts Not in Dispute (ECF #41), and in opposition the Plaintiffs filed a Statement of Disputed Facts (ECF #56). Both filings generally adhere to the requirements of LR 56.1 and LR 56.2 in that both statements address the same facts and mostly cite to record evidence in support of their contentions. In support of their own Motion, the Plaintiffs included a Statement of Undisputed Facts in their Memorandum in Support (ECF #44, pp. 1-5), and AFCO responded with a Statement of Disputed Facts (ECF #55). The Plaintiffs' Statement of Undisputed Facts in support of their motion mostly focuses on the specific circumstances surrounding each payment, AFCO's alleged post-petition demands on the Debtor, and AFCO's recovery of unearned premiums from the insurer. AFCO's Statement of Disputed Facts does not address those facts, thus deeming them admitted to the extent they are supported by record evidence, but instead puts forward arguments supporting AFCO's affirmative defenses.

The Court was generally able to determine the material undisputed facts from the parties' competing statements.

As AFCO has moved for summary judgment on all eight of the claims asserted in the Complaint, the Court's analysis will track those claims, beginning with the most heavily litigated claim, Count I's avoidance of preferential transfers.

## ANALYSIS

### Count I: Avoidance of Preferential Transfers

Both parties have moved for summary judgment on Count I of the Complaint, which seeks to avoid the Debtor's July and August 2017 payments to AFCO, totaling

$52,840.07, as preferential transfers. The Plaintiffs have also moved for summary judgment on AFCO's statutory affirmative defenses of "ordinary course of business" and "new value."

The Plaintiffs bear the burden of proof at trial on each element of a preference claim under § 547(b) of the Code. *In re Gulf Fleet Holdings, Inc.*, 485 B.R. at 334. Thus, in order to prevail, the Plaintiffs must show that there is no genuine issue of material fact with respect to each statutory element of their preference claim, and that they are entitled to judgment as a matter of law. Section 547(b) provides that a trustee may avoid any transfer of an interest in property—

> (1) to or for the benefit of a creditor;
>
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>
> (3) made while the debtor was insolvent;
>
> (4) made--
>
>> (A) on or within 90 days before the date of the filing of the petition; or
>>
>> (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>
> (5) that enables such creditor to receive more than such creditor would receive if--
>
>> (A) the case were a case under chapter 7 of this title;
>>
>> (B) the transfer had not been made; and
>>
>> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

The summary judgment record establishes the first four elements of the Plaintiffs' preference claim as a matter of law. First, the Debtor's July and August payments to AFCO represented a transfer of the Debtor's property to a creditor. Second, the transfer was made on account of an antecedent debt—the debt created

8

under the terms of the Finance Agreement. Third, because AFCO has not refuted it, "[t]he Trustee can also rely on the presumption of insolvency during the ninety-day reach-back period. *See* 11 U.S.C. § 547(f)." *Gulf Fleet*, 485 B.R. at 335. Fourth, it is undisputed that the two payments were made within 90 days of the petition date.

The fifth and final element requires the Plaintiffs to establish that AFCO received more than it would have in a liquidation under Chapter 7 as a result of the payments the Debtor made to AFCO during the preference period. 11 U.S.C. § 547(b)(5). As this Court has explained:

> This requirement "simply carries out 'the common sense notion that a creditor need not return a sum received from the debtor prior to bankruptcy if the creditor is no better off *vis-a-vis* the other creditors of the bankruptcy estate than he or [she] would have been had the creditor waited for liquidation and distribution of the assets of the estate.'" *In re Hager,* 109 F.3d 201, 210 (4th Cir. 1997) (quoting *In re Virginia–Carolina Financial Corp.,* 954 F.2d 193, 198–99 (4th Cir. 1992)). . . . *Ordinarily, a payment to a fully secured creditor does not satisfy section 547(b)(5) because that creditor would not receive more than it would otherwise receive in a Chapter 7 liquidation upon the sale of its collateral.*

*In re Gulf Fleet Holdings, Inc.*, 485 B.R. at 335 (emphasis added). The parties dispute whether this fifth element is satisfied.

AFCO contends that the Plaintiffs cannot meet their burden under § 547(b)(5) because AFCO possessed a perfected security interest in the unearned premiums and was fully secured at the time of the July and August transfers. Thus, as "a fully secured creditor," AFCO contends the Plaintiffs cannot "satisfy section 547(b)(5) because [AFCO] would not receive more than it would otherwise receive in a Chapter 7 liquidation upon the sale of its collateral." *In re Gulf Fleet Holdings, Inc.*, 485 B.R. at 335; *see also American Honda Finance Corp. v. A. Angelle, Inc. (In re A. Angelle, Inc.)*, 230 B.R. 287, 299 (Bankr. W.D. La.), *modified*, 230 B.R. 306 (Bankr. W.D. La. 1998) ("The court agrees with AHFC's position that section 547(b)(5) will protect the transferee where the transferee is fully secured.").

The Plaintiffs set forth three arguments in support of their contention that the requirements of § 547(b)(5) are met here. First, the Plaintiffs assert that AFCO's security interest was not in property of the Debtor because the unearned premiums in possession of the third-party insurer were assigned to AFCO in full ownership. Alternatively, if AFCO has a security interest in Debtor's property, the Plaintiffs contend AFCO's security interest was not properly perfected under Louisiana law. Third, and also in the alternative, if the Court finds AFCO has a perfected security interest in the Debtor's property, then the Plaintiffs contend that AFCO's secured status on the date of each transfer during the preference period is not controlling. Instead, the Plaintiffs contend that AFCO must be fully secured on the petition date. According to the Plaintiffs, AFCO's own evidence shows it was not fully secured on that date, thus causing AFCO to receive more than it would have received in a Chapter 7 liquidation as a result of the two payments during the preference period. The Court will address each of these arguments in turn.

> *1. Did the Finance Agreement effect an immediate assignment of the unearned premiums to AFCO, or was AFCO only granted a security interest in those premiums?*

The Plaintiffs contend that the July and August payments by the Debtor to AFCO are avoidable as preferences because AFCO was secured by property that was not owned by the Debtor. According to the Plaintiffs:

> [T]he Fifth Circuit stated in *In re N.A. Flash Found. Inc.*, [that] the § 547(b)(5) "inquiry focuses 'not on whether a creditor may have recovered all of the monies owed by the debtor ***from any source whatsoever***,' but instead on whether the creditor would have recovered 100% of the debt from ***the debtor's estate***." 298 Fed. Appx. 355, 359 (5th Cir. 2008) (emphasis added) (quoting *In re Virginia-Carolina Fin. Corp.*, 954 F.2d 193, 199 (4th Cir. 1992)). Accordingly, payments to creditors that are "fully secured" by property ***not of the debtor*** are avoidable as preferences

10

under Section 547(b)(5). *See, e.g., In re Powerine Oil Co.*, 59
F.3d 969, 972 (9th Cir. 1995).[4]

The Plaintiffs' argument rests entirely on this Court finding that the Finance Agreement resulted in an immediate and enforceable assignment of the unearned premiums to AFCO rather than the grant of a security interest in those premiums. The Plaintiffs cite three cases in which they claim the court made such a finding: *In re Remcor, Inc.*, 186 B.R. 629, 636-37 (Bankr. W.D. Pa. 1995); *In re Woodyard*, 248 B.R. 261, 264 (Bankr. M.D. Pa. 2000); and *In re Felder*, 97-05465-B, 2000 WL 33710885, at *12-15 (Bankr. D.S.C. July 7, 2000). Both *Remcor* and *Woodyard* looked to Pennsylvania law to determine that the finance agreements at issue in those cases resulted in an assignment of the unearned premiums to the finance company rather than the grant of security interest. In *Felder*, the court concluded an assignment of certain unearned premiums had occurred under a loan agreement governed by South Carolina law. Further, the contract language at issue was written only as an assignment, with no mention of the premiums serving as security or additional collateral.

The holding in each of the cases cited by the Plaintiffs turned on application of state law, and none of those cases involved contracts governed by Louisiana law. The Finance Agreement here, however, is governed by Louisiana law. Thus, this Court will look to Louisiana law governing the interpretation of contracts to determine whether an immediately enforceable assignment of the unearned premiums was made to AFCO under the terms of the Finance Agreement.

The Fifth Circuit set forth the principles for interpreting contracts governed by Louisiana law in *Dore Energy Corp. v. Prospective Inv. & Trading Co., Ltd.*, 570 F.3d 219 (5th Cir. 2009). Whether a contract is ambiguous is a legal question. *Id.* If the contract is not ambiguous, then interpreting it is also a legal issue for the court. *Id* at 225. A court may consider extrinsic evidence as to the parties' intent only if the contract is ambiguous. *Id.; see also Conerly Corp. v. Regions Bank*, 668 F. Supp. 2d

---

[4] See Plaintiffs' Memorandum in Opposition to AFCO's Motion for Summary Judgment, ¶ 3 (ECF #56) (emphasis in the Plaintiffs' brief).

11

816 (E.D. La. 2002), citing *Campbell v. Melton¸* 817 So. 2d 69, 75 (La. 2002). A contract is considered ambiguous on the issue of intent when it lacks a provision bearing on that issue, the terms of a written contract are susceptible to more than one interpretation, there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed. *Id.; see also* La. Civ. Code art. 1848.

"Each provision in a contract must be interpreted in light of other provisions giving each provision a meaning suggested by the contract as a whole and avoiding any interpretation that neutralizes or ignores any provision or treats it as surplusage." *Texas Eastern Transmission Corp. v. Amerada Hess Corp.,* 145 F.3d 737, 743 (5th Cir. 1998) (interpreting Louisiana law)); *see also Lambert v. Maryland Cas. Co.,* 418 So. 2d 553, 559 (La. 1982) ("A cardinal rule in the construction of contracts is that the contract must be viewed as a whole and, if possible, practical effect given to all its parts, according to each the sense that results from the entire agreement so as to avoid neutralizing or ignoring any of them or treating them as surplusage.")[5]

Louisiana courts have had occasion to consider whether a contract resulted in an immediate assignment of property or the creation of a security interest. These cases were summarized in *Conerly Corp.*:

> As a preliminary matter, there is a distinction to be drawn between an assignment of an asset, and the offering of security to be held until a loan is paid. *See BG Wire Rope & Slings, Inc. v. Dyson,* 884 So. 2d 688, 691 (La. App. Ct. 2004). The former "transfers title of the asset to the assignee, who then has the immediate right, upon signing of the agreement, to pursue payment of the loan from the assigned asset." *Id.* With the latter, "the creditor must wait until the debtor defaults on the loan before the asset may be used for payment." *Id.; see also Mahayna, Inc. v. Poydras Center Assoc.,* 693 So. 2d 355, 358–59 (1997) ("The defining difference between a pledge and an assignment of ownership is the transferee's immediate right in this case to pursue and collect judgment proceeds

---

[5] The Court's analysis is also guided by the rules of contract interpretation set forth in La. Civ. Code arts. 2045-2057

> contemporaneously with the signing of the agreement."),
> *writ denied,* 703 So. 2d 619 (1997). . . .

*Conerly Corp.*, 668 F. Supp. 2d at 827–28.

Turning to this case, the Court finds that the Finance Agreement expresses a clear and unambiguous intent that AFCO be granted a security interest in the unearned premiums as collateral for repayment of the loan. The Finance Agreement provides in Paragraph 3, that "the Insured [Debtor] assigns and hereby gives a security interest to AFCO as collateral for the total amount payable in this agreement and any other past, present or future extension of credit: (a) any and all unearned premiums which may become payable for any reason under all insurance policies financed by AFCO." Although this provision includes the word "assignment," the Court finds that the provision, when read as whole, creates a security interest in the unearned premiums, as the agreement states that the assignment is of a "security interest" in the unearned premiums, to serve as "collateral."

Perhaps most importantly, the Finance Agreement, by its terms, did not give AFCO the immediate right, upon signing of the agreement, to pursue payment of the loan from the assigned asset—the unearned premiums. Rather, under Paragraphs 3 and 12 of the Finance Agreement, AFCO was required to wait until the Debtor defaulted on the loan before AFCO could cancel the policies and receive payment of the unearned premiums.[6] This factor alone makes the assignment in paragraph 3 a security interest, not an immediate, enforceable assignment. *See Conerly Corp.*, 668 F. Supp. 2d at 827-28.

The Court's conclusion is further supported by the definitions of "security interest" and "collateral." "Security interest" is defined as "a property interest created

---

[6] Under paragraph 3 of the Finance Agreement, Debtor "irrevocably appoint[ed] AFCO as its attorney in fact with full authority to (i) cancel all insurance financed by AFCO for the reason set forth in paragraph 12, . . . (ii) receive all sums hereby assigned to AFCO and (iii) execute and deliver on the [Debtor]'s behalf all documents, instruments or payment, forms and notices of any kind relating to the insurance in furtherance of this agreement. Paragraph 12 of the agreement authorizes "AFCO [to] *cancel all insurance policies financed by AFCO* . . . *if the [Debtor] does not pay any installment according to the terms of this . . . agreement* . . ." *See* ECF #55-1, p. 6 (emphasis added).

by agreement or by operation of law to secure performance of an obligation (esp. repayment of a debt)." *Black's Law Dictionary* (7th ed. 1999). "Collateral" means "property that is pledged as security against a debt; property subject to a security interest." *Id.* Thus, when the words of the Finance Agreement are given their generally prevailing legal meaning, the parties' intent is obvious.

In contrast, not only does the Plaintiffs' interpretation of Paragraph 3 fail to give "security interest" and "collateral" their generally prevailing meaning, it completely reads those terms out of the Finance Agreement. Under the Plaintiffs' interpretation, the phrase "assigns and hereby gives a security interest" in the first sentence of paragraph 3 of the Finance Agreement must be interpreted to mean that both the word "assigns" and "gives a security interest" refer to the same object, i.e., the unearned premiums. Under that reading, the Debtor somehow purported to fully assign the unearned premiums to AFCO while also granting a security interest in them. If ownership of the unearned premiums was fully assigned to AFCO, however, the terms "security interest" and "collateral" would have no meaning in the agreement and would be rendered as mere surplusage.

The phrase can be read in another way, however, with "assigns and hereby gives" both referring to "a security interest." That reading would effect merely the transfer of a security interest in the unearned premiums, which would make more sense than purporting to both fully transfer the unearned premiums and create a security interest in them for the now full owner, AFCO.

Accordingly, the Court concludes that the Debtor granted AFCO a security interest in the unearned premiums. Because the Finance Agreement did not, upon execution, transfer the Debtor's ownership of the unearned premiums to AFCO, those funds remained property of the Debtor for purposes of § 547(b)(5).[7]

---

[7] The Court notes that although the Debtor did not immediately transfer ownership of the unearned premiums to AFCO upon execution of the Finance Agreement, the Debtor nonetheless would not be entitled to receive those unearned premiums in the event it failed to pay and AFCO canceled the insurance policy, which is what happened in this case. This point is not relevant to Count I but is relevant to Count VI's post-petition transfers claim, discussed below.

## 2. Was AFCO's security interest perfected?

The parties dispute whether AFCO's security interest was perfected. At the outset, the Court notes that AFCO did not perfect its security interest in the unearned premiums by filing the Finance Agreement or a UCC-1 financing statement in Louisiana's public records as authorized under Louisiana's version of Article 9 of the UCC. AFCO contends, however, that premium financing arrangements are excluded from the provisions of Article 9. *See* La. Rev. Stat. § 10:9-109(d)(8) ("This Chapter does not apply to: . . . a transfer of an interest in or an assignment of a claim under a policy of insurance, other than life insurance and other than an assignment by or to a health-care provider of a health-care-insurance receivable and any subsequent assignment of the right to payment . . ."). AFCO also notes that at least 47 other states exclude security interests in insurance contracts from the requirements of Article 9.

No Louisiana court has addressed the question of whether security interests in unearned premiums are excluded from Article 9. But courts from other jurisdictions that have addressed this issue have uniformly held that security interests in unearned insurance premiums are not covered by Article 9. *See American Bank, FSB v. Cornerstone Community Bank*, 733 F.3d 609 (6th Cir. 2013) (applying Tennessee law and finding the Article 9 of the UCC excludes the transfer of an interest in a policy of insurance); *In re QA3 Financial Corp.*, 2011 WL 1297840 (Bankr. D. Neb. 2011) (applying Nebraska law and holding that insurance premium financing is specifically exempted from Article 9 of the UCC, stating: "the drafters of the U.C.C. considered the area involving claims to and under insurance policies to be sufficiently distinct and well-regulated to warrant their exclusion from Article 9's filing requirements."); *In re Silver State Helicopters, LLC*, 403 B.R. 849 (Bankr. D. Nev. 2009) (applying Nevada law and finding that insurance premium financing is specifically exempted from Article 9 of the UCC); *In re St. James, Inc.*, 402 B.R. 209 (Bankr. E.D. Mich. 2009) (applying Michigan law and finding a security interest in unearned premiums under a premium finance agreement were excluded from coverage under Article 9 of the Michigan UCC, and thus non-UCC law would apply

15

to trustee's adversary proceeding seeking to hold as preferences payments made to premium finance company during the 90 day period preceding filing); *In re JII Liquidating, Inc.,* 344 B.R. 875, 885 (Bankr. N.D. Ill. 2006) (applying Illinois law and stating that every jurisdiction that has considered the issue has uniformly held that Article 9 of the UCC "is not applicable to unearned insurance premiums"); *In re Teligent Inc.*, 377 B.R. 39, 44 (Bankr. S.D.N.Y. 2005) (same, applying New York and Virginia law); *Uly-Pak, Inc. v. Consol. Ins. Agency, Inc. (In re Uly-Pak, Inc.)*, 101 B.R. 551, 553-54 (Bankr. S.D. Ill. 1989) (same, applying Illinois law and stating: "[T]he draftsmen [of the UCC] felt that such transactions are adequately covered by existing law and do not fit within the framework of Article 9." (internal quotation omitted)).

The Plaintiffs have not cited a single case in which the court concluded that unearned insurance premiums are covered by Article 9 of the UCC. The Court notes that "uniformity [among the jurisdictions] must be accorded great weight when ascertaining whether or not a transaction should be excluded from the scope of Article 9." *In re JII Liquidating, Inc.*, 344 B.R. at 884 (internal quotation omitted). This Court agrees with the decisions from the majority (if not all) other jurisdictions that have considered this issue and finds that Louisiana's version of Article 9 of the UCC does not apply to the Finance Agreement and AFCO's security interest in the unearned insurance premiums.

The question remains whether AFCO's security interest in the unearned premiums was nonetheless perfected without filing under Louisiana law and thus effective as to third parties. The answer would seem to be yes under La. Rev. Stat. § 9:3550(I), which provides that "no filing of the premium finance agreement shall be necessary to perfect the validity of such agreement as a secured transaction as against creditors, subsequent purchasers, pledges, encumbrances, successors, or assigns." *Id.* However, as pointed out by the Plaintiffs, this statute seems to only apply to a premium finance company that finances insurance premiums "for consumers," with "consumer" being defined in Louisiana's consumer finance law as a natural person who purchases goods, services, or movable or immovable property or rights therein, for a personal, family, or household purpose. *See* La. Rev. Stat. §

16

9:3516(10). The Plaintiffs also point out that at least one court has restricted the application of La. Rev. Stat. § 9:3550 to situations involving the financing of premiums for individual consumers:

> In 1995, when the Louisiana legislature amended La. R.S. 9:3550 to include the words "for consumers" the intent seems to have been to restrict, or to clarify an implicit restriction in, the application of this statute. The Court interprets this restriction as barring the application of La. R.S. 9:3550 in situations, such as the one presented in the instant case, where a commercial enterprise has entered into what is essentially a business loan for a business purpose.

*Colony Ins. Co. v. NJC Enterprises*, 927 F. Supp. 2d 319, 327 (M.D. La. 2013).

The Plaintiffs argue that because § 9:3550, as interpreted by *Colony Ins. Co.,* only applies to the financing of insurance premiums for consumers, then the filing exclusion in § 9:3550(I) only applies in consumer transactions, meaning the opposite rule must apply when insurance premium financing is provided to a non-consumer (a juridical person), such as the Debtor. The Court disagrees. For one thing, at least one Louisiana court of appeal that was facing the same issue as the court in *Colony Ins. Co.*, applied § 9:3550 in a commercial context to find that the premium finance company had properly canceled the underlying insurance when the insured defaulted in repaying the loan to the finance company. *See Dotson v. Regency Park Townhome Owners Association*, 229 So. 3d 606 (La. Ct. App. 2016) (without discussion of whether La. R.S. § 9:3550 is limited to transactions involving individual consumers, the court found that the premium finance company, which had been granted a power of attorney to cancel insurance coverage for non-payment of its loan, properly canceled, in accordance with § 9:3550, a commercial general liability policy issued to a limited liability company). For another, as shown above, premium finance agreements are excluded from coverage by Article 9 of the UCC, and the Plaintiffs have not pointed to any other positive law in Louisiana that would require such a filing in the non-consumer context.

17

AFCO, on the other hand, has pointed to other positive law in Louisiana that supports its argument that recordation of the Finance Agreement was not necessary for perfection. According to AFCO, "to the extent that there was a partial, contingent assignment of the unearned premiums by the Debtor to AFCO, such assignment was 'effective against the debtor and third persons . . . from the time the debtor has actual knowledge, or has been given notice of the assignment.'" AFCO's Reply Brief, pp. 10-11 (ECF # 63-1) (quoting La. Civ. Code art. 2643). Under La. Civ. Code art. 2643, an assignment of a right is effective as to third parties when the "debtor" has actual knowledge of the assignment or has been given notice of the assignment.

Under the facts presented here, "debtor" in the context of art. 2643 is Lloyd's of London, as it is the party that would owe the assigned obligation—the payment of the unearned premiums—if the insurance policies were canceled. Lloyd's obviously had actual knowledge and notice of the assignment of the unearned premiums through its agent Ellsworth. Thus, the conditional assignment of the unearned premiums to AFCO by the Debtor, i.e., Linder, was effective as to Lloyd's of London and all third parties upon Lloyd's actual knowledge and notice of the Finance Agreement.

The Louisiana Supreme Court upheld this rule in *Folse v. Dale*:

> It has been held that the assignment of an incorporeal right grants the assignee an inchoate title only until notice of the assignment is served on the debtor and the assignor's property rights and interest may be seized by his creditor up to the time of notice to the debtor but not thereafter. *Kimball v. Plant et al.*, 14 La. 10; *Dolsen v. Brown*, 13 La. Ann. 551; *Marshall v. Morehouse*, 14 La. Ann. 689; *Relf v. Boro*, 17 La. Ann. 258; *White v. Bird*, 20 La. Ann. 282; *Golsan v. Powell*, 32 La. Ann. 521 and *Newman v. Irwin*, 43 La. Ann. 1114, 10 So. 181.
>
> Counsel for the plaintiff has not referred us to any law which required the assignee to record the assignment in the mortgage office or to have it judicially recognized. Obviously, this would have been a wiser and more precautious procedure to follow. In the absence of any legal requirement to do so, the plaintiff cannot be deprived of her

18

> property rights as notice to the debtors was given according
> to law.

197 La. 511, 2 So. 2d 6, 10 (1941); *see also In re Clayton Grain Elevator, Inc.*, 46 B.R. 257, 259 (Bankr. W.D. La. 1984) (when the debtor on a bond, the Louisiana Department of Agriculture, was not notified that payee on such obligation had assigned his rights under the bond to a bank as additional security in a crop pledge agreement, the assignment was not effective as to the debtor or third parties).

Based on the Court's examination of the above authorities, the Court rejects the Plaintiffs' argument that AFCO was required to file the Finance Agreement or a UCC-1 to perfect its interest in the unearned premiums. Louisiana's version of Article 9 does not apply to this transaction and thus the filing requirements under that law are simply inapplicable to this case. Moreover, even though La. Rev. Stat. § 9:3550(I) may be limited to consumer transactions, it nonetheless speaks to the issue presented, and that statute expressly states filing is not necessary for a premium finance agreement's effectiveness as to third parties. The Plaintiffs have not provided a single reason why the rule should be different when a commercial entity finances insurance premiums, nor have they pointed to any other law in Louisiana that would impose such a requirement for perfection. These factors, coupled with the law on assignments that only requires actual knowledge or notice of an assignment to the debtor, i.e., the insurer here, to be effective against third parties, all indicate that AFCO was perfected.

Finally, as a federal court considering state law, this Court "may not 'adopt innovative theories of state law,' but must 'apply that law as it currently exists.'" *Aspen Specialty Ins.*, 514 F. Supp. 2d 972, 982 (S.D. Tex. 2007) (quoting *Galindo v. Precision American Corp.*, 754 F.2d 1212, 1217 (5th Cir. 1985)). All indications are that Louisiana law does not impose a filing requirement for the perfection of a security interest in unearned premiums on a commercial insurance policy. If this Court were to impose such a filing requirement where none exists, it would likely effect a change to state law. If a state's law is to be changed, it is up to the state's legislature or the "Supreme Court of [that state] and not [a federal] court to change

19

. . . substantive law." *Cargill, Inc. v. Offshore Logistics, Inc.* 615 F.2d 212, 215 (5th Cir. 1980); *Aspen Specialty Ins. Co.*, 514 F. Supp. 2d at 982.

Accordingly, this Court will not create a filing requirement where none exists either statutorily or jurisprudentially in Louisiana. Thus, the Court concludes that AFCO's security interest was properly perfected even though the Finance Agreement was not filed.

### 3. Should AFCO's collateral be valued as of the petition date or the transfer date?

AFCO contends that because it was fully secured *at the time of each transfer* it received from the Debtor during the preference period, the Plaintiffs cannot meet their burden under § 547(b)(5). The Plaintiffs disagree, arguing that the date for determining AFCO's secured status is the Debtor's *bankruptcy petition date*, and they assert AFCO was undersecured on that date. Thus, the Plaintiffs contend AFCO received more than it otherwise would have in Chapter 7 through the two payments made during the 90 days prior to the petition date.

The Plaintiffs' argument is primarily based on *Palmer Clay Products Co. v Brown*, 297 U.S. 227, 56 S. Ct. 450, 80 L. Ed. 655 (1936). In that case, the Supreme Court addressed whether the transfer date or the petition date should govern when considering preferential transfers:

> Whether a creditor has received a preference is to be determined, not by what the situation would have been if the debtor's assets had been liquidated and distributed among his creditors at the time the alleged preferential payment was made, but by the actual effect of the payment as determined *when bankruptcy results*.

*Id.* at 229 (emphasis added). Taken at face value, *Palmer* supports the Plaintiffs' argument that AFCO's secured status must be determined as of the petition date.

Courts, however, have not uniformly applied *Palmer* in cases in which the creditor is fully or partially secured. As a result, "there is a split of authority as to whether the value of the creditor's collateral is to be determined at the time of the transfer or as of the petition date." 5 *Collier on Bankruptcy* ¶ 547.03[7], n.125

(Richard Levin & Henry J. Sommer, eds., 16th ed.). This split is on full display in the cases that have addressed alleged preferential transfers to premium financing companies.

On the one hand, there are cases that have applied *Palmer* to conclude that the premium finance company's collateral should be valued on the petition date. *See Falcon Creditor Trust v. First Ins. Funding (In re Falcon Prods.)*, 381 B.R 543 (B.A.P. 8th Cir. 2008), and *Gray v. A.I. Credit Corp. (In re Paris Industries, Corp.)*, 130 B.R. 1 (Bankr. D. Me. 1991). In *Paris*, the finance company was fully secured by the unearned premiums on the date of the transfer, but it lost its secured status during the following 90 days due to the diminishing amount of unearned premiums securing its loan, which were earned ratably day by day. The trustee argued that since the premium finance company was unsecured on the date of bankruptcy, the alleged preferential payments allowed it to receive more than it would have in a Chapter 7. The *Paris* court agreed, concluding that the elements of § 547(b)(5) were met.

To determine the amount of the preference, the *Paris* court added back to the finance company's outstanding balance due from the debtor on the petition date, which was zero, the payment received during the preference period, and then compared that amount to the premium finance company's collateral remaining on that date, which was zero. Since the amount due from the creditor after adding back the disputed payments was more than the collateral value on the petition date, the court concluded that the Trustee had satisfied the requirements of § 547(b)(5).

In *Falcon*, the bankruptcy court had sided with those cases that valued the premium finance company's collateral as of the transfer date, and thus granted summary judgment in favor of the premium finance company. The Bankruptcy Appellate Panel for the Eight Circuit reversed, agreeing with the *Paris* court that the collateral should be valued as of the petition date. The Panel also adopted the *Paris* court's "add-back" approach for determining the amount of the preference. In doing so, the premium finance company went from an equity cushion of $259,074.03 in the unearned premiums on the petition date to being undersecured by $38,062.14. Although *Falcon* observed that "it seems almost illogical to find that a payment on a

21

claim fully secured at the time of the transfer might be preferential under § 547(b)," it nonetheless found that *Palmer* mandated that the collateral be valued as of the petition date. *In re Falcon Prods.,* 381 B.R. at 548.

On the other hand, there are courts that have distinguished *Palmer* on the grounds that the *Palmer* court only addressed payments to unsecured creditors during the preference period. It is on this basis that the courts have fashioned a different analysis for determining whether a secured creditor may have received a preference payment. *See Rocor, supra,* and *Schwinn, supra.*[8]

In *Schwinn*, the court concluded that the petition date was not controlling when determining whether a secured creditor may have received a preferential payment. The court rejected the "add-back" method espoused by *Paris*, and instead established a two-step process for determining whether the premium finance company received a preference. The first step is to determine the actual secured status of the creditor immediately prior to the alleged preferential transfer: "[i]f a creditor is fully secured, then it follows that a payment to that creditor merely reduced the secured claim, and releases from the security interest the same amount of collateral. Hence if the creditor is fully secured prior to payment, it cannot be preferenced in having received the payment." *Schwinn*, 200 B.R. at 991.

The second step of the analysis is to determine "whether each payment was accompanied by the release of an equivalent value of collateral." *Id.* at 992. If the payment to the creditor results in a release of an equivalent value of collateral, then the newly released value would theoretically be made available to the rest of the bankruptcy estate. The *Schwinn* court concluded that "each time an installment was paid to [the finance company] . . . a corresponding amount of unearned premium was

---

[8] *Savage & Associates, P.C. v. A.I. Credit Corp. (In re Teligent)*, 337 B.R. 39 (Bankr. S.D.N.Y. 2005), also addressed whether payments made to a premium finance company during the 90 day period prior to the bankruptcy filing were preferential. Although the court referenced *Schwinn*, the court's decision rested on the fact that the premium finance company was oversecured as of the date of each payment during the preference period. The court did not discuss the premium finance company's secured status on the petition date; nor did the court reference the Supreme Court's decision in *Palmer*.

released and would have been available for distribution to the unsecured creditors had Schwinn canceled the coverage."[9] *Id.* at 993.

The *Schwinn* court also believed it was important that the premium finance company remain fully secured throughout the 90 day preference period, noting that its "analysis . . . would be inapplicable to a creditor who is unsecured at any time during the 90 day period." *Id.* at 995, n.15. The court explained:

> It is clear why, if a premium finance company is always secured, it cannot be preferenced in the 90–day period. At no time would unsecured creditors lose any value in their claims. The premium finance company is only receiving payment as the collateral is diminished. The diminishing of the collateral is allowed by the premium finance company because its indebtedness is also diminished through payments from debtor, thereby maintaining its equity cushion. Where debtor ceases to make payments to the premium finance company, the company has a costless remedy at its disposal, which is to cancel the policy and receive the rest of the debt it is owed by taking it out of unearned premiums. Debtor's estate is in no way being depleted by payments made to a premium insurance company which has a standard financing agreement in place.

*Id.*

In *Rocor*, the Bankruptcy Appellate Panel for the Tenth Circuit determined that the approach taken in *Schwinn* "is the appropriate method for analyzing preference actions in cases involving premium financing." 380 B.R. at 574. The court provided several reasons for its decision. First, it explained that a ruling against the premium finance company would "chill this common financing mechanism and

---

[9] Note that it is this second step of the *Schwinn* analysis that has drawn the most criticism from the courts that adhere to the *Palmer* rule in premium financing cases. The *Palmer* adherents view this step as impermissibly blending the defenses to preference actions under § 547(c) of the Code into the § 547(b) analysis. The court in *Falcon* stated: "The impetus to limit *Palmer* to situations involving payments on unsecured claims is understandable—it seems almost illogical to find that a payment on a claim fully secured at the time of the transfer might be preferential under § 547(b). But the resolution of that illogic does not lie in refashioning the hypothetical liquidation test of § 547(b)(5) to incorporate elements of § 547(c) preference defenses, as many courts have done; rather, it comes in the *separate* application of those defenses to the preferential transfer at issue." 381 B.R. at 548 (emphasis in original).

diminish the ability of financially troubled companies to obtain insurance." *Id.* It also found that disallowing the payments to the premium finance company as preferential would in no way further the policy of preventing a race to the courthouse and would likely thwart the policy of equal distribution among similarly situated creditors. The court also stressed that payments to a fully secured premium finance company would not deplete the bankruptcy estate because that collateral would be released upon payment. Finally, the court found that a finding in favor of the bankruptcy estate would create a windfall for the estate to the detriment of the finance company because the estate would have the benefit of the finance company's collateral, the premiums, and also reap the reward of recovering the coverage payment for distribution to the unsecured creditors. *Id.* at 574-75.

After considering these two approaches, this Court, like the court in *Rocor*, finds that the approach taken in *Schwinn* is the appropriate method for analyzing preference actions in cases involving premium finance companies. While the Court generally agrees with the reasoning in *Schwinn* and *Rocor*, the Court is primarily relying on Fifth Circuit jurisprudence for its conclusion, specifically *Krafsur v. Scurlock Permian Corp., (In re El Paso Refinery, L.P.)*, 171 F.3d 249 (5th Cir. 1999), and *Garner v. Knoll, Incorporated (In re Tusa-Expo Holdings, Inc.)*, 811 F.3d 786 (5th Cir. 2016), because the Fifth Circuit's analysis in those cases for determining whether a trustee has met his or her burden under § 547(b)(5) closely resembles certain aspects of the *Schwinn* analysis.

In *El Paso,* the court drew a distinction between unsecured and secured transactions in the context of § 547(b), noting that secured transactions do not necessarily fall neatly into the *Palmer* rule:

> The greater percentage test is most easily understood in the context of an unsecured creditor that receives prepetition payments. In that case, if the unsecured creditor received more than he would have if the payments had been retained by the estate and then distributed to all the unsecured creditors after paying the secured creditors in a bankruptcy proceeding, the unsecured creditor impermissibly received a greater percentage by preference.

24

> *In contrast, a fully secured creditor who receives a prepetition payment does not receive a greater percentage than he would have in a bankruptcy proceeding because as a fully secured creditor he would have recovered 100% payment in a bankruptcy proceeding. . . .*

171 F.3d at 253–54 (emphasis added). The *El Paso* court was not dealing with a fully secured creditor. Thus, it fashioned a rule for determining whether an undersecured creditor receives more from an alleged preference payment than it would have in a Chapter 7 liquidation:

> To determine whether an undersecured creditor received a greater percentage of recovery on its debt than it would have under chapter 7 the following two issues must first be resolved: (1) to what claim the payment is applied and (2) from what source the payment comes. *See In re El Paso Refinery,* 178 B.R. 426, 434 (Bankr. W.D. Tex. 1995). Both aspects must be examined before the issue of greater percentage recovery can be decided.

*Id.* at 254. The court defined the first issue—to what claim the payment is applied—as the "application aspect." The second issue—from what source the payment comes—was defined as the "source aspect."

The court first explained the "application aspect." The court concluded that if a payment to an undersecured creditor is applied to the unsecured portion of the debt, then the undersecured creditor will have necessarily recovered a greater percentage on this claim if the estate cannot pay 100% of claims. *Id.* at 254. The court noted the outcome would be different if the payment were applied to the secured portion of the claim:

> In contrast, if the undersecured creditor applies the payment to the secured portion of the debt, the creditor effectively releases a portion its collateral from its security interest, that is, its secured claim is reduced, freeing up a corresponding amount of collateral. In this situation, the creditor does not receive a greater recovery. If, however, the creditor does not actually release collateral upon application of the payment, then the payment is ipso facto a payment on the unsecured portion of the claim. . . .

25

*Id.* (emphasis added). The court then explained the "source aspect":

> Even if the payment in question was applied to the unsecured portion of an undersecured creditor's claim, the creditor will not be deemed to have receive a greater percentage as a result of the payment if the source of the payment is the creditor's own collateral. A creditor who merely recovers its own collateral receives no more as a result than it would have received anyway had the funds been retained by the debtor, subject to the creditor's security interest.

*Id.* at 254-55. The *El Paso* court found that the secured creditor did not release any collateral when it received payment during the preference period, but it determined that the source of the payment was the creditor's collateral. Thus, the court concluded the Trustee failed to satisfy § 547(b)(5) by showing the creditor received a greater percentage of recovery than it would have in a bankruptcy proceeding. *Id.* at 258.

The Fifth Circuit revisited the *El Paso* analysis in *Tusa-Expo*. The court emphasized that the § 547(b)(5) analysis typically requires the "so-called 'hypothetical Chapter 7 liquidation analysis,'" which requires the court to (1) construct a hypothetical Chapter 7 liquidation in which the creditor retains the disputed transfers, *viz.* "the transfers-*retained* hypothetical," and (2) construct another in which the creditor returns those transfers, *viz.*, "the transfers-*returned* hypothetical." *Tusa-Expo*, 811 F.3d at 792 (emphasis in original). "To establish the requirement of § 547(b)(5) under this analysis, the sum of (1) the disputed transfers and (2) the creditor's distribution in the transfers-retained hypothetical must be 'more' than the creditor's distribution in the transfers-returned hypothetical." *Id.*

The *Tusa-Expo* court then explained how the *El Paso* analysis may be used to avoid having to do the hypothetical Chapter 7 liquidation analysis:

> But a court may occasionally circumvent the often arduous hypothetical Chapter 7 liquidation analysis by employing the abbreviated *El Paso Refinery* analysis. **This analysis considers only the disputed transfer itself.** It is premised on the truism that, if a creditor receives a transfer which, by its very nature, would not have been available to any of the other secured or unsecured

26

creditors, it could never receive "more" under the hypothetical Chapter 7 analysis. . . .

If the disputed transfer (1) reduced the creditor's collateral under the application aspect of the *El Paso Refinery* analysis *or* (2) was made from the debtor's collateral under the source aspect of that analysis, the trustee could never establish that the creditor received "more" under the hypothetical Chapter 7 analysis. But only in such an instance is the *El Paso Refinery* analysis dispositive. If, conversely, the disputed transfer (1) did *not* reduce the creditor's collateral under the application aspect *and* (2) was *not* made from the debtor's collateral under the source aspect, the trustee might still be able to establish that the creditor received "more" under the hypothetical Chapter 7 liquidation analysis. Simply put, the *El Paso Refinery* analysis provides a threshold. It is intended to aid the hypothetical Chapter 7 liquidation analysis under § 547(b)(5), not to replace it. Nor could it. As the hypothetical Chapter 7 liquidation analysis is embodied in § 547(b)(5), it must control.

*Id.* at 792-93 (italics in original, bolding added). The court ultimately concluded that "because the Trustee did not satisfy the source aspect of the *El Paso* analysis" (because the source of payment was shown to be the creditor's own collateral), "testing under the hypothetical liquidation analysis [was] unnecessary." *Id.* at 799.

Based on the Court's examination of these Fifth Circuit decisions, it concludes that, in the context of whether an insurance premium financing company received a preferential payment, the Fifth Circuit would likely apply its application aspect analysis, which is similar to the *Schwinn* analysis, rather than the strict reading of *Palmer* applied by *Falcon* and *Paris*. The Court's conclusion is primarily based on two factors.

First, the "application aspect" analysis is essentially the same as the *Schwinn* two-step approach for determining whether a premium finance company received a preference payment. They both look to whether the creditor was fully secured immediately prior to a transfer, and both require a determination of whether the creditor's collateral was released or reduced following payment in an amount that

27

equals the amount of the payment. If both are true, then it is unlikely the bankruptcy estate could establish that the creditor received more than it would have in a hypothetical Chapter 7 liquidation. The fact that the Fifth Circuit applied the El Paso analysis nearly 20 years later in, *Tusa-Expo*, shows that this approach remains consistent in this Circuit.

Second, the *Schwinn* court actually cited the original bankruptcy court decision in *El Paso*, 178 B.R. 426 (Bankr. W.D. Tex. 1995), in support of its two-step test of determining (1) the status of the creditor as secured or unsecured on the date of filing and (2) whether each installment released an equivalent value of collateral. *See Schwinn*, 200 B.R. at 991-94. This shows that the *Schwinn* court considered the lower *El Paso* decision to be consistent with its own analysis. Although the Fifth Circuit reversed the *El Paso* bankruptcy court's decision after *Schwinn* was issued, it did so not because the lower court had applied the wrong legal standard but that it had not gone far enough because it only looked at the application aspect and had not considered the source aspect. Specifically, while the Fifth Circuit found no clear error in the lower court's finding that the defendant was undersecured and had never released any collateral (the application aspect), it concluded that the lower court had failed to rule for the defendant because the source of the payments was proceeds of collateral in which the defendant held a security interest (the source aspect). 178 F.3d at 254-55. Because a defendant may prevail under § 547(b) under *either* the application aspect or the source aspect, the defendant was entitled to judgment.

There are differences between the *El Paso* analysis and the *Schwinn* analysis, however, in that *El Paso* holds that even if the application aspect is not satisfied, the trustee will be unable to carry his or her burden under § 547(b)(5) if the source of the payment was the creditor's collateral (the source aspect), which in most premium financing arrangements will only occur if the insurance policies are canceled during the preference period. Thus, the *El Paso* analysis provides an additional basis for precluding a preference payment claim under the appropriate circumstances. *Schwinn* also differs from *El Paso* in that it suggests that the insurance premium financing company must remain fully secured throughout the preference period. The

28

equals the amount of the payment. If both are true, then it is unlikely the bankruptcy estate could establish that the creditor received more than it would have in a hypothetical Chapter 7 liquidation. The fact that the Fifth Circuit applied the El Paso analysis nearly 20 years later in, *Tusa-Expo*, shows that this approach remains consistent in this Circuit.

Second, the *Schwinn* court actually cited the original bankruptcy court decision in *El Paso*, 178 B.R. 426 (Bankr. W.D. Tex. 1995), in support of its two-step test of determining (1) the status of the creditor as secured or unsecured on the date of filing and (2) whether each installment released an equivalent value of collateral. *See Schwinn*, 200 B.R. at 991-94. This shows that the *Schwinn* court considered the lower *El Paso* decision to be consistent with its own analysis. Although the Fifth Circuit reversed the *El Paso* bankruptcy court's decision after *Schwinn* was issued, it did so not because the lower court had applied the wrong legal standard but that it had not gone far enough because it only looked at the application aspect and had not considered the source aspect. Specifically, while the Fifth Circuit found no clear error in the lower court's finding that the defendant was undersecured and had never released any collateral (the application aspect), it concluded that the lower court had failed to rule for the defendant because the source of the payments was proceeds of collateral in which the defendant held a security interest (the source aspect). 178 F.3d at 254-55. Because a defendant may prevail under § 547(b) under *either* the application aspect or the source aspect, the defendant was entitled to judgment.

There are differences between the *El Paso* analysis and the *Schwinn* analysis, however, in that *El Paso* holds that even if the application aspect is not satisfied, the trustee will be unable to carry his or her burden under § 547(b)(5) if the source of the payment was the creditor's collateral (the source aspect), which in most premium financing arrangements will only occur if the insurance policies are canceled during the preference period. Thus, the *El Paso* analysis provides an additional basis for precluding a preference payment claim under the appropriate circumstances. *Schwinn* also differs from *El Paso* in that it suggests that the insurance premium financing company must remain fully secured throughout the preference period. The

28

equals the amount of the payment. If both are true, then it is unlikely the bankruptcy estate could establish that the creditor received more than it would have in a hypothetical Chapter 7 liquidation. The fact that the Fifth Circuit applied the El Paso analysis nearly 20 years later in, *Tusa-Expo*, shows that this approach remains consistent in this Circuit.

Second, the *Schwinn* court actually cited the original bankruptcy court decision in *El Paso*, 178 B.R. 426 (Bankr. W.D. Tex. 1995), in support of its two-step test of determining (1) the status of the creditor as secured or unsecured on the date of filing and (2) whether each installment released an equivalent value of collateral. *See Schwinn*, 200 B.R. at 991-94. This shows that the *Schwinn* court considered the lower *El Paso* decision to be consistent with its own analysis. Although the Fifth Circuit reversed the *El Paso* bankruptcy court's decision after *Schwinn* was issued, it did so not because the lower court had applied the wrong legal standard but that it had not gone far enough because it only looked at the application aspect and had not considered the source aspect. Specifically, while the Fifth Circuit found no clear error in the lower court's finding that the defendant was undersecured and had never released any collateral (the application aspect), it concluded that the lower court had failed to rule for the defendant because the source of the payments was proceeds of collateral in which the defendant held a security interest (the source aspect). 178 F.3d at 254-55. Because a defendant may prevail under § 547(b) under *either* the application aspect or the source aspect, the defendant was entitled to judgment.

There are differences between the *El Paso* analysis and the *Schwinn* analysis, however, in that *El Paso* holds that even if the application aspect is not satisfied, the trustee will be unable to carry his or her burden under § 547(b)(5) if the source of the payment was the creditor's collateral (the source aspect), which in most premium financing arrangements will only occur if the insurance policies are canceled during the preference period. Thus, the *El Paso* analysis provides an additional basis for precluding a preference payment claim under the appropriate circumstances. *Schwinn* also differs from *El Paso* in that it suggests that the insurance premium financing company must remain fully secured throughout the preference period. The

28

equals the amount of the payment. If both are true, then it is unlikely the bankruptcy estate could establish that the creditor received more than it would have in a hypothetical Chapter 7 liquidation. The fact that the Fifth Circuit applied the El Paso analysis nearly 20 years later in, *Tusa-Expo*, shows that this approach remains consistent in this Circuit.

Second, the *Schwinn* court actually cited the original bankruptcy court decision in *El Paso*, 178 B.R. 426 (Bankr. W.D. Tex. 1995), in support of its two-step test of determining (1) the status of the creditor as secured or unsecured on the date of filing and (2) whether each installment released an equivalent value of collateral. *See Schwinn*, 200 B.R. at 991-94. This shows that the *Schwinn* court considered the lower *El Paso* decision to be consistent with its own analysis. Although the Fifth Circuit reversed the *El Paso* bankruptcy court's decision after *Schwinn* was issued, it did so not because the lower court had applied the wrong legal standard but that it had not gone far enough because it only looked at the application aspect and had not considered the source aspect. Specifically, while the Fifth Circuit found no clear error in the lower court's finding that the defendant was undersecured and had never released any collateral (the application aspect), it concluded that the lower court had failed to rule for the defendant because the source of the payments was proceeds of collateral in which the defendant held a security interest (the source aspect). 178 F.3d at 254-55. Because a defendant may prevail under § 547(b) under *either* the application aspect or the source aspect, the defendant was entitled to judgment.

There are differences between the *El Paso* analysis and the *Schwinn* analysis, however, in that *El Paso* holds that even if the application aspect is not satisfied, the trustee will be unable to carry his or her burden under § 547(b)(5) if the source of the payment was the creditor's collateral (the source aspect), which in most premium financing arrangements will only occur if the insurance policies are canceled during the preference period. Thus, the *El Paso* analysis provides an additional basis for precluding a preference payment claim under the appropriate circumstances. *Schwinn* also differs from *El Paso* in that it suggests that the insurance premium financing company must remain fully secured throughout the preference period. The

28

*El Paso* court never imposes such a requirement, and it would not seem to be relevant to the reasoning set out in the opinion.

Turning to this case, the summary judgment evidence before the Court suggests that AFCO was fully secured immediately prior to the two transfers at issue, though it is impossible for the Court to determine because AFCO's summary of its secured status is based in part on its own Collateral Burn Analysis, which has significant problems, as discussed immediately below. It also seems highly probable that each payment made under the Finance Agreement would satisfy the application aspect of the *El Paso* test (which is consistent with the *Schwinn* analysis). That is because the entire debt under the Finance Agreement was secured, and AFCO's security interest in the unearned premiums covered only the amount of the remaining debt, meaning each payment by the Debtor to AFCO should have resulted in the release of a corresponding amount of collateral. However, because the parties largely focused on other issues in their briefing, they have not presented a great deal of evidence on these points, and at least some of the evidence pertinent to these issues is subject to factual disputes. These issues should proceed to trial so that the parties may present evidence relevant to the *El Paso* test.

Furthermore, to the extent the Court must also apply *Schwinn*'s requirement that the insurance premium finance company remain fully secured during the preference period, the relevant evidence (some of which is also relevant to the strict *El Paso* factors) is subject to genuine factual disputes. Most significantly, AFCO's Statement of Uncontested Facts submitted in support of its Motion for Summary Judgment refers to a "true and correct copy of the Unearned Premium balance history made by Debtor to AFCO" (ECF #41, ¶ 10), bearing the title "Collateral Burn Analysis." *See* Ex. 4 to AFCO's Statement (ECF #41-1). This Collateral Burn Analysis shows a remaining unearned premium balance of nearly $100,000 immediately prior to the last payment in August 2017, and a balance of $62,093.88 on the petition date, October 10, 2017. The Plaintiffs' Statement of Contested Facts purports to deny AFCO's Collateral Burn Analysis on the grounds that AFCO's own corporate representative testified that she did not know who prepared the document, that it is

29

therefore hearsay, and that the third party insurer's records would be the best evidence (ECF #56, p. 20). However, as the deposition transcript submitted by the Plaintiffs shows, AFCO's corporate representative testified that the Collateral Burn Analysis is the type of document that AFCO would keep, and although she did not know which individual prepared it, she knew an AFCO associate had prepared it because AFCO routinely produced those types of analyses as needed. Though it is possible the document could fall under the "records of a regularly conducted activity" exception to the hearsay rule under Fed. R. Evid. 803(6), the Court is unwilling to make that determination at the summary judgment stage.

Even if the Collateral Burn Analysis were deemed inadmissible, its exclusion would not necessarily help the Plaintiffs, who bear the ultimate burden on their § 547 claim. They have never proffered either the insurer's calculations of unearned premiums or any evidence showing that AFCO's Collateral Burn Analysis is incorrect. Thus, the Collateral Burn Analysis is the best evidence (admissible or not) before the Court at this stage, and it is worth analyzing it if only to provide guidance to the parties.

Though there are substantial problems with the Collateral Burn Analysis, AFCO's methodology in creating the document is not one of them. The Plaintiffs argue that "AFCO could offer no testimony relating to its methodology in calculating the return premium,"[10] but the document speaks for itself, and it is trivial to determine the methodology. The document plainly shows a daily reduction in unearned premiums in the amount of $766.59 as the third party insurer earned the premium by providing coverage to the Debtor. The Plaintiffs' attempt to obfuscate the issue while offering no competing evidence falls short of the requirements of both Fed. R. Civ. P. 56 and LR 56.2. Thus, assuming the Collateral Burn Analysis is admissible, the Court would have little trouble interpreting it.

The document does not resolve the question before the Court, however, because it calculates the remaining unearned premiums at $62,093.88 on the petition date,

---

[10] Plaintiffs' Statement of Disputed Facts, ¶ 10 (ECF #56).

October 10, 2017, while AFCO's own account payment history, attached as Exhibit 2 to its Statement of Uncontested Facts, shows the total debt owed by the Debtor on October 11, 2017 at $73,730.37, which had remained constant since the Debtor's final payment in August 2017. (Similar inconsistencies between the Collateral Burn Analysis and AFCO's own account payment history make it impossible for the Court to determine, without weighing the evidence, whether AFCO was in fact fully secured immediately prior to each of the two payments at issue, which is the first prong of both the *Schwinn/Rocor* and *El Paso/Tusa-Expo* tests. This would be sufficient to preclude summary judgment under the *El Paso* test even if AFCO's secured status during the entire preference period is irrelevant.)

If the unearned premium balance actually stood at only $62,093.88 on the petition date, as AFCO's Collateral Burn Analysis suggests, then the Court would have to agree with the Plaintiffs that AFCO was undersecured by nearly $12,000 on the petition date. The summary judgment evidence strongly suggests that the Plaintiffs are wrong, however. As shown by the summary judgment evidence submitted by AFCO, it appears that AFCO canceled the insurance policy in September 2017 and received a check in the amount of $75,298.55 from the agent of the third party insurer in November 2017. If that payment was comprised entirely of unearned premiums, then it would appear AFCO remained fully secured for the duration of the policy. However, the ambiguity does not end at the Collateral Burn Analysis or the final check from the insurer: An October 20, 2017 demand letter sent by AFCO to the Debtor states that AFCO anticipated that even after the refund of the unearned premiums, the Debtor would still owe AFCO $2,082.98,[11] which raises some doubt as to whether AFCO remained fully secured.

Though the Court believes the balance of the evidence supports AFCO's position and would likely result in AFCO prevailing at trial,[12] the summary judgment

---

[11] *See* Ex. S to the Plaintiffs' Motion (ECF #44-1), App. 093.

[12] At trial on this same evidence, the Court might surmise that cancellation of the insurance policy in September meant that the insurer would no longer provide any further coverage and could earn no further premiums, preventing the unearned premiums held by the insurer from dropping in

standards preclude the Court from drawing any factual inferences or weighing the evidence, so it is impossible at this stage for the Court to determine the relevant facts.

In sum, based on the evidence, the Court believes it more probable than not that AFCO will prevail at trial in showing that the Trustee has failed to prove the § 547(b)(5) factor under the *El Paso* test. However, the evidence concerning the *El Paso* factors is not sufficiently clear to permit summary judgment, and the Court has had to do much of the factual analysis itself. Furthermore, in the event *Schwinn*'s requirement of full security throughout the preference period is required,[13] similar factual disputes preclude summary judgment. Because the Court will need to take evidence on the *El Paso* factors at trial, the Court will reserve the issue of AFCO's status during the preference period for trial as well.

The Court is mindful of the fact that AFCO has also asserted affirmative defenses that might allow it to prevail even if it loses this issue, but AFCO did not move for summary judgment on its defenses. The Plaintiffs did move for summary judgment on these defenses, but the Court concludes that these issues are more properly considered at trial due to their intrinsically fact-intensive nature and the fact that neither party has presented sufficient evidence to make a determination at this stage.

---

value thereafter. The Court could also surmise that the $75,298.55 check paid by the insurer to AFCO represented the remaining unearned premium balance, which remained higher than the total debt owed by the Debtor to AFCO even on the petition date, meaning that AFCO was fully secured both at the time of the Debtor's two transfers during the preference period and at all times through the petition date. Finally, the Court could infer that the Collateral Burn Analysis prepared and submitted by AFCO was prepared prospectively to cover the entire anticipated life of the Finance Agreement assuming the Debtor continued to pay to completion, without taking into account the cancellation of the insurance policy due to the Debtor's nonpayment after August 2017. (Of course, had the Debtor continued to pay through the petition date, the amount of the outstanding debt to AFCO would have also been reduced by each payment, apparently leaving AFCO fully secured.) The biggest wrinkle is AFCO's own demand letter anticipating a shortfall of approximately $2,000 after receiving the unearned premium check, but it is entirely possible AFCO was wrong.

[13] The Court takes no position at this stage on this issue, in part because it would not resolve the case due to factual disputes and in part because neither party clearly laid out the proper legal analysis in its briefing, so they will be able to present their arguments at trial with the benefit of this opinion.

*4. Count I: Conclusion*

In summary, on Count I, the Court concludes that the Finance Agreement, created a security interest in the unearned premiums and that AFCO's interest was perfected. However, the Court finds that factual issues preclude a determination on summary judgment of whether AFCO was fully secured prior to the payments, whether the payments satisfy the "application aspect" of the *El Paso/Schwinn* test, and, to the extent it is relevant, whether AFCO remained fully secured during the preference period under *Schwinn*, though it appears probable AFCO will prevail on all three factors from the evidence submitted so far. The Court will hold a trial on these questions, and the parties may present any relevant evidence and arguments, including any applicable affirmative defenses. The Court will now turn to the remaining claims.

## Count II: Conversion of Cadle's Collateral

In Count II, Cadle alone asserts a claim against AFCO for conversion of its collateral. AFCO argues that the Court lacks jurisdiction to hear this claim because it is essentially a state law claim by a non-debtor against another non-debtor, and the outcome will not affect the administration of the estate. Put differently, AFCO argues that Cadle's claim is so remote from the actual bankruptcy proceeding that the Court lacks even "related to" jurisdiction under 28 U.S.C. § 1334(b). Even if a court possesses jurisdiction under 28 U.S.C. § 1334(b), it may permissively abstain under 28 U.S.C. § 1334(c)(1) under certain circumstances, including "the effect or lack thereof on the efficient administration of the estate if the court recommends abstention, "extent to which state law issues predominate over bankruptcy issues," "jurisdictional basis, if any, other than § 1334," and "degree of relatedness or remoteness of proceeding to main bankruptcy case." *See, e.g., Thomas v R.J. Reynolds Tobacco Co.*, 259 B.R. 571, 578-79 (S.D. Miss. 2001).

The Plaintiffs do not address this argument in their Memorandum in Opposition (ECF #56) to AFCO's Motion for Summary Judgment, and in their own Memorandum in Support of Summary Judgment (ECF #44), they only assert that

33

"[b]ecause lack of subject matter jurisdiction is not an affirmative defense, this Court should dispose of it as a matter of law." That argument must fail, of course, because "[a] litigant generally may raise a court's lack of subject-matter jurisdiction at any time in the same civil action, even initially at the highest appellate instance," and a court may raise the issue *sua sponte* as well. *See Kontrick v. Ryan*, 540 U.S. 443, 455 (2004) (collecting cases).

As AFCO correctly points out, this Court exercised permissive abstention under 28 U.S.C. § 1334(c)(1) on a similar conversion claim by Cadle against a non-debtor third party in another adversary proceeding under this same bankruptcy case. *See* Order on Rule 12(b)(6) Motion, *Sikes v. Emerald Coast Energy*, 19-05096 (Bankr. W.D. La. Apr. 8, 2020) (ECF #21). The Court concludes that the same result should apply here. A state law claim by a non-debtor against another non-debtor where any recovery on the claim will go to the plaintiff non-debtor rather than to the bankruptcy estate is so remote from the bankruptcy case as to make even "related to" jurisdiction doubtful, but even if the Court possesses "related to jurisdiction," the balance of factors fully, *see, e.g., Thomas v R.J. Reynolds Tobacco Co.*, 259 B.R. 571, 578-79 (S.D. Miss. 2001), supports abstaining from the claim and allowing Cadle to pursue it in a more appropriate forum if it wishes to do so. Accordingly, the Court exercises permissive abstention over Cadle's conversion claim in Count II.

<u>Count III: Actual Fraudulent Transfer</u>

Count III purports to set forth an actual fraudulent transfer claim under § 548(a)(1)(A). Fed. R. Civ. P. 9(b) provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." As AFCO points out, the Plaintiffs asserted no facts in the Complaint supporting actual fraud. *See* AFCO's Memorandum in Support, pp. 18-23 (ECF #40). The Plaintiffs' Memorandum in Opposition (ECF #56) to AFCO's Motion for Summary Judgment does not address this argument at all; indeed, it does not address

any of the counts other than Count I. Neither do the Plaintiffs address the issue of actual fraud in their Memorandum in Support of Summary Judgment (ECF #44).

It is not surprising that the Plaintiffs have failed to even put an argument forward in support of their actual fraud claim because the Complaint is bereft of any facts supporting it. The Court will therefore dismiss the actual fraud claim, Count III, for failure to satisfy Fed. R. Civ. P. 9(b).

## Count IV: Constructive Fraudulent Transfer

Count IV of the Complaint argues that the payments made by the Debtor to AFCO within the two years prior to the petition under the Finance Agreement constitute constructive fraudulent transfers under § 548(a)(1)(B) because even if they were made on account of an antecedent debt (the Finance Agreement), "the Debtor did not receive reasonably equivalent value, or any value whatsoever, in exchange for the monies transferred to Defendant," and the Debtor was insolvent or became insolvent as a result of the transfers. Complaint, ¶ 34 (ECF #1).

The Court must dismiss this claim for the reasons set out in *Matter of Louisiana Pellets, Inc.*, 838 F. App'x 45 (5th Cir. 2020), which affirmed this Court's opinion in *In re Louisiana Pellets, Inc.*, No. 16-80162, 2019 WL 2565670 (Bankr. W.D. La. June 20, 2019). First, § 548(a)(1)(B) provides:

> The trustee may avoid any transfer ... of an interest of the debtor in property, or any obligation ... incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily ... received less than a reasonably equivalent value in exchange for such transfer or obligation; and ... was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation[.]

*Id.* As the Fifth Circuit noted: "Put simply, this section allows a trustee to nullify certain inflated transactions to conserve the debtor's estate for the benefit of creditors. Any significant disparity between the value received and the obligation assumed will have significantly harmed the innocent creditors of the debtor. Unlike

the provisions on actual fraud, the constructive fraud provision is not concerned with the debtor's intent, but rather the value the debtor received." 838 F. App'x at 49 (citations and internal quotation marks omitted).

"Whether a debtor received reasonably equivalent value is a two-part inquiry: (1) whether the debtor received value, and (2) whether that value was reasonably equivalent." *Id*. Value, which is determined on the date of transfer, is not subject to later fluctuations in the value of assets, nor is it necessary for a debtor to receive exact equivalent value. *Id*. "When a debtor makes a payment on antecedent debt and receives a dollar-for-dollar reduction of that debt, however, the question is easy because the debtor by definition receives reasonably equivalent value—indeed, *exactly* equivalent value, assuming, of course that the debt itself was based upon value." *Id*. at 50 (citations omitted, emphasis in original).

In other words, where a debtor is obligated to make payments under an antecedent debt, and each payment reduces the debtor's remaining debt, the debtor is deemed to have received reasonably equivalent value. Moreover, the Fifth Circuit affirmed in the *Louisiana Pellets* case that, separate from this antecedent debt analysis, a debtor who pays as required under a contract receives reasonably equivalent value in the form of keeping a contract alive by not breaching it:

> it was also not clear error to hold that GPLA received reasonably equivalent value in another form: These payments ensured that GPLA did not breach the contract, keeping alive "the expected future benefit" of Line B1, and potentially Phase II. *See id*. (citing [*In re Treasure Valley Opportunities, Inc.*, 166 B.R. 701, 704 (Bankr. D. Idaho 1994).] (recognizing "the continued vitality of [a] contract" as "an asset in a substantial sense")). We AFFIRM the bankruptcy court's ruling that these three payments were not constructive fraudulent transfers.

*Id*. at 52. The *Schwinn* court addressed similar considerations in the insurance premium financing context, albeit in its analysis of § 547(b):

> A very basic assumption under § 547 is that value is transferred out of the estate. Here, however, the estate received value in return for each payment. Every day, Schwinn received coverage. Schwinn could not have had

36

any insurance coverage had it not made the payments the Committee now claims to be preferential. It was established at trial that, had Schwinn been delinquent in any of the preferential payments, TIFCO would have canceled the policy. There was evidence that TIFCO had in place an automatic system which would send a notice of possible cancellation and a cancellation notice out on a set schedule if the regularly scheduled payments were not received. Debtor also had granted TIFCO power of attorney to cancel the insurance coverage in case it ceased making the scheduled payment. Premium finance companies have such measures in place so that they do not become unsecured at any time during the period of a loan by virtue of their inexorably declining collateral. There is no conceivable reason for a premium finance company to allow its collateral to diminish while debtor fell behind in its payments. Undoubtedly, upon the expiration of the cure period required by the applicable state statute, TIFCO's computer would have mailed a Notice of Intent to Cancel. If Schwinn would not have cured the default, a Notice of Cancellation would have been mailed, thereby canceling the insurance coverage.

*Schwinn*, 200 B.R. at 994.

In this case, pursuant to the Finance Agreement, AFCO paid the third party insurer the entire premium, and the Debtor was required to make a monthly payment to AFCO. Each payment the Debtor made reduced its further payment obligation on a dollar-for-dollar basis, and making payments was necessary to maintain policy coverage because AFCO was authorized to cancel the policy in the event of the Debtor's nonpayment.

Accordingly, the Court must conclude that the payments in question were made on an antecedent debt (the Debtor's obligations under the Finance Agreement), and the Debtor received reasonably equivalent value in the form of (a) a dollar-for-dollar reduction in its remaining debt under the Finance Agreement, and (b) the continued vitality of the Finance Agreement, which allowed the Debtor to continue to enjoy insurance coverage. The Court will therefore dismiss the constructive fraudulent transfer claim, Count IV.

## Count V: Revocatory Action

Count V of the Complaint asserts a Louisiana state law revocatory action claim. La. Civ. Code art. 2036 provides: "An obligee has a right to annul an act of the obligor, or the result of a failure to act of the obligor, made or effected after the right of the obligee arose, that causes or increases the obligor's insolvency." As the Fifth Circuit explained in *Louisiana Pellets*:

> The Louisiana revocation statute is broader than § 548, requiring only that the debtor-obligor do something after a creditor's rights accrue "that causes or increases the obligor's insolvency." La. Civ. Code Ann. art. 2036. Reasonable equivalence is not a consideration. *See id.* Payments on antecedent debt do not increase a debtor's insolvency because its balance sheet remains neutral. *See Gulf Fleet*, 491 B.R. at 766–77. The bankruptcy court held that none of the five disputed payments were avoidable under article 2036. *La. Pellets*, 2019 WL 2565670, at *4.
>
> For the reasons discussed above in the previous section, all five disputed payments were on antecedent debt, so they did not increase GPLA's insolvency. We therefore AFFIRM the bankruptcy court's ruling that the payments are not avoidable under article 2036.

838 F. App'x at 52.

The same reasoning applies here. Because the Court concludes that the payments from the Debtor to AFCO were made on an antecedent debt (the Finance Agreement), they cannot support a Louisiana revocatory action claim. The Court will dismiss this claim, Count V, as well.

## Count VI: Recovery of Post-Petition Transfers

Count VI of the Complaint states: "*If* the Debtor made a transfer to Defendant on account of obligations that arose before the Petition Date and that cleared the Debtor's bank accounts after the Petition Date, such transfer or transfers were unauthorized post-petition transfers and are avoidable under 11 U.S.C. § 549." Complaint, ¶ 42 (ECF #1) (emphasis added). AFCO argues that there were no post-

petition transfers by the Debtor. The Plaintiffs' only argument on this point is that "if AFCO intends to argue that the unearned premiums were property of the estate, then AFCO knowingly and willfully violated the automatic stay by collecting the unearned premiums from Lloyd's of London in the amount of $75,298.55 on November 3, 2017, which is approximately three weeks after the Debtor filed bankruptcy and at least ten days after AFCO received notice of the Debtor's bankruptcy filing." Plaintiffs' Memorandum in Opposition, p. 10 (ECF #56). (The Court notes that although AFCO sent a demand letter to the Debtor, discussed above, stating AFCO's belief that it might still be owed approximately $2,000 after receiving the check for unearned premiums, there is no evidence or even allegation that the Debtor paid AFCO anything following the petition date, so the Plaintiffs have no claim under § 549 on that basis.)

What the Plaintiffs ignore is that the Debtor assigned a security interest in the unearned premiums to AFCO in the premium agreement, allowing AFCO to acquire the unearned premiums in the event the Debtor failed to make the required payments and AFCO canceled the policy. When the Debtor failed to make any payment after August 2017, AFCO canceled the insurance policy pursuant to the Finance Agreement, and under the terms of the Finance Agreement only AFCO, not the Debtor, had the right to receive the unearned premiums, which in any event were paid to AFCO not by the Debtor but by the third party insurer. Because the Debtor made no post-petition transfer of any estate property, the Court must dismiss Count VI as well.

Even if AFCO's interest in the unearned premiums was only a security interest as of the petition date, the Court would not avoid the post-petition transfer under § 549. As one treatise notes:

> On occasion a debtor may transfer property of the estate that is subject to an unavoidable prepetition security interest to the holder of the secured claim. While such transfers technically may be avoided under section 549, the courts take a pragmatic view and elect not to avoid the transfer because avoidance would not benefit the estate. Underlying these holdings is the assumption that the

> property to be recovered would still be subject to the
> security interest and would have to be returned to the
> secured creditor in any event.

5 *Collier on Bankruptcy* ¶ 549.04 (16th 2020) (Richard Levin & Henry J. Sommer, eds., 16th ed.) Thus, even if AFCO's interest remained that of a security interest as of the petition date, the Court nonetheless could not avoid the transfer for the above reasons.

Count VII: Recovery of Avoided Transfers

Count VII seeks to recover, under 11 U.S.C. § 550(a), any transfers found to be avoidable under any other count. Because the Court reserves Count I for trial on the questions discussed above, the Court must deny summary judgment on this count.

Count VIII: Disallowance of All Claims

Count VIII seeks to disallow all claims by AFCO in the event it has been found to receive an avoidable transfer. As with Count VII, the Court must deny summary judgment on this count.

Other Issues

Finally, to the extent any issues raised in the parties' Motions have not been addressed herein, including AFCO's affirmative defenses, summary judgment is denied, and those issues are reserved for trial to the extent they may remain applicable.

**Conclusion**

For the reasons set out above, AFCO's Motion for Summary Judgment (ECF #39) is GRANTED IN PART as to Counts II, III, IV, V, and VI, as well as on the determinations under Count I that the Finance Agreement: (a) created a security interest in the unearned premiums and did not assign ownership of the unearned premiums directly to AFCO, and (b) the security interest was perfected under these circumstances without the need for AFCO to file anything. AFCO's Motion for Summary Judgment is DENIED IN PART on the questions under Count I of:

(a) whether AFCO was fully secured immediately prior to each transfer; (b) whether the two preference period payments at issue satisfy the application aspect of the *El Paso/Schwinn* test (or, alternatively, the source aspect of the *El Paso* test); and, if relevant, (c) whether AFCO remained fully secured throughout the preference period under *Schwinn.* AFCO's Motion is also DENIED IN PART as to Counts VII and VIII. The Plaintiffs' Motion for Partial Summary Judgment (ECF #42) is DENIED. The trial in this case shall be limited to the unresolved questions discussed in this opinion and any affirmative defenses that may be relevant to the associated claims. The Court shall enter a separate Order in conformity with this Ruling.